IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GARRETT STEPHENSON, et al. | § | |
| *Plaintiffs* | § | |
| | § | SA-22-CV-01296-XR |
| -vs- | § | |
| | § | |
| RACKSPACE TECHNOLOGY, INC, | § | |
| *Defendant* | § | |

## ORDER ON MOTION TO COMPEL ARBITRATION

On this date, the Court considered Defendant Rackspace Technology, Inc.'s motion to compel individual arbitration (ECF No. 23), Plaintiffs' response (ECF No. 30), Defendant's reply (ECF No. 31), and the parties' arguments at the hearing held on April 6, 2023. After careful consideration, the Court issues the following order.

### BACKGROUND

These consolidated, putative class action cases arise from a cybersecurity incident purportedly discovered and announced by Defendant Rackspace Technology, Inc. ("Rackspace") on or about December 2, 2022 (the "Security Incident"), in which unauthorized individuals gained access to its information network through a ransomware attack that allegedly affected over 30,000 Rackspace customers.[1] Rackspace, a cloud services provider, offers a Hosted Exchange environment, which allows clients to avoid hosting email on their own computers or network servers. Thirty-seven Named Plaintiffs purport to represent both nationwide and various state putative classes, alleging claims for damages and injunctive relief relating to the disruption

---

[1] Garrett Stephenson and Gateway Recruiting, LLC ("Gateway") filed a class action on December 5, 2022, seeking damages, injunctive and equitable relief in connection with the security incident. *Garrett Stephenson et al.. Rackspace Technology, Inc*., No. 5:22-cv-1296-XR ("*Stephenson* Action"), ECF No. 1. The subsequent actions were filed under the *Stephenson* Action. See *Ondo v. Rackspace Technology, Inc.*, No. 5:22-cv-1306-XR ("*Ondo* Action"), ECF No. 9; *Q Industries, Inc. v. Rackspace Technology, Inc*., No. 5:22-cv-1322-XR ("*Moser* Action"), ECF No. 9; *Lethe v. Rackspace Technology, Inc*., No. 5:22-cv-1378-XR ("*Lethe* Action"), ECF No. 4.

of their email services, which allegedly resulted in the permanent loss of some communications and potential disclosure of sensitive information.[2]

The parties present competing theories of the cause of Plaintiffs' alleged damages. Plaintiffs assert that the third parties were able to access Rackspace's network because it failed to deploy a security patch provided by Microsoft on November 8, 2022, and that Rackspace's mismanaged response to and communications about the ransomware attack further interrupted their business operations. ECF No. 30 at 9–10.[3] Rackspace observes that its agreements with Hosted Exchange clients provide that (1) clients are responsible for maintaining routine back-ups of their data, (2) neither party is liable to the other for data loss, (3) Rackspace can suspend email services in the event of an attack, and (4) account credits are the sole remedy for service interruptions. ECF No. 23 at 10–11.

All prospective Hosted Exchange clients must agree to the then-current version of Rackspace's governing terms, including a Master Services Agreement ("MSA"), in order to complete the transaction to begin using the services. *See* ECF No. 23-2, Decl. of Josh Prewitt (Chief Product Officer of Rackspace) ¶ 15. Hosted Exchange customers typically sign up for Hosted Exchange services through the online cart on the Rackspace website (the "Online Signup Process"). *See id.* ¶¶ 16–17. The Online Signup Process involves four steps. *See id.* ¶¶ 20–23.

(1) The customer must first confirm the services requested and click a button labeled "Next Step" in order to proceed. *See id.* ¶ 20; Ex. 3.

(2) The customer must enter account and contact information and again click a button labeled "Next Step" in order to proceed: *See id.* ¶ 21; Ex. 4.

(3) The customer must provide an address, and again click a button labeled "Next Step" in order to proceed. *See id.* ¶ 22; Ex. 5.

---

[2] Rackspace acknowledges that 27 of its customers also had files moved during the Security Incident but maintains that none of the Named Plaintiffs were among the clients whose data was moved without their authorization and, accordingly, cannot purport to represent a putative class of such customers.

[3] Page numbers in citations to the record refer to PDF page numbers as the document was filed on CM/ECF, which are not necessarily the same as the page numbers in the underlying documents.

> (4)   Finally, the customer must provide payment information, check a statement agreeing to be bound by each of three hyperlinked agreements—the MSA, the Mail Terms of Service, and the Office 365 Services Terms of Service—and click a button labeled "submit" to complete the transaction. *See id.* ¶ 23; Ex. 6.

While the vast majority of Hosted Exchange customers sign up for services through the Online Signup Process, some customers register by signing and returning the then-governing terms through an electronic signature program ("eSig Process"). *See id.* ¶¶ 16–17; Ex. 2. The service order used in the eSig Process expressly incorporates the then-current MSA by reference. *Id.* ¶ 17. It also requires the customer to agree to the following language:

> The Agreement constitutes the complete and exclusive agreement between the parties regarding the subject matter and supersedes and replaces any prior understanding or communication, written or oral. The individual signing represents to Rackspace that they are authorized to sign on behalf of Customer. Customer accepts the terms of the Agreement, including any document or terms referenced above.

*Id.* ¶ 17; Ex. 2.

Rackspace asserts that, at all relevant times, the governing terms have required Hosted Exchange customers to agree that Rackspace can periodically update its terms, and the updates become effective on the customer's next renewal date, through a provision substantially similar to the language below:

> Some terms are incorporated into the Agreement by reference to pages on the Rackspace website and Rackspace may revise those terms from time to time (including the MSA). Except where otherwise designated, ***such revisions are effective and supersede and form part of the Agreement*** as of the time: (i) Customer enters into a new Service Order referencing the revised terms; (ii) a Service Order automatically renews pursuant to the Agreement; or (iii) the parties enter into an agreement for a Renewal Term or account transfer (in which case Customer acknowledges that it has reviewed and accepted the then-current version of the terms).

*Id.* ¶ 26; Ex. 8 (emphasis added). The "Agreement" as defined in the MSA, "means, collectively, the MSA and any terms incorporated by reference in the MSA, and any applicable Service

3

Order, Product Terms, or other addenda which govern the provision of Services." *Id.*, Ex. 8 at Schedule 1 (Defined Terms). For Hosted Exchange customers, these collective agreements and terms include, among others, the MSA, the Mail Terms of Service, and the Global Security & Privacy Practices. *See id.* ¶ 34.

Thus, according to Rackspace, if a Hosted Exchange customer allows its services, which are renewed monthly, to continue after Rackspace's governing terms have been updated, that customer agrees to be bound by the updated terms as of the date of the service renewal. *Id. see also id.* ¶ 28; *id.*, Ex. 7 (Service Order related to an Agreement executed through the Online Signup Process reflecting a monthly term); *id.*, Ex. 2 (Service Order related to an Agreement executed through the eSig Process reflecting a monthly term). Because Rackspace updated its MSA on June 21, 2022, Rackspace asserts that the June 2022 version of the MSA became effective for all Hosted Exchange Customers no later than July 21, 2022. *See id.* ¶ 28; Ex. 8. Therefore, Rackspace argues, every Hosted Exchange Customer that was affected by the December 2, 2022 Security Incident is bound by the June 21, 2022 MSA. *See id.*

Section 10 of the June 2022 MSA contains a broad arbitration provision and class action waiver:

> Where stated to be subject to arbitration in Schedule 2, any dispute or claim relating to or arising out of the Agreement shall be submitted to binding arbitration. The arbitration shall be conducted in the state and county (or equivalent geographic location) of the non-asserting party's principal business offices in accordance with the Commercial Rules of the AAA in effect at the time the dispute or claim arose. The arbitration shall be conducted by one arbitrator from AAA or a comparable arbitration service. The arbitrator shall issue a reasoned award with findings of fact and conclusions of law. Either party may bring an action in any court of competent jurisdiction to compel arbitration under the Agreement, or to enforce an arbitration award.

*Id.* ¶ 29; Ex. 8. § 10.2. Schedule 2 provides that where, as here, the contracting entity is Rackspace US, Inc., all disputes shall be resolved through arbitration. *Id.* at Schedule 2. In

4

addition, Section 10.3 of the MSA states, "No claim may be brought as a class or collective action, nor may Customer assert such a claim as a member of a class or collective action that is brought by another claimant." *Id.*, Ex. 8 § 10.3.

Based on the arbitration clause and class action waiver, Rackspace now moves to compel individual arbitration in this matter and dismiss or, alternatively, stay this case pending arbitration. *See* ECF No. 23. Plaintiffs urge the Court to deny the motion, arguing that (1) their claims fall outside the scope of the arbitration clause, (2) the arbitration clause does not bind Plaintiffs who entered into an agreement with Rackspace before the incorporation of an arbitration clause, and (3) the arbitration clause is procedurally and substantively unconscionable. *See* ECF No. 30. The Court held a hearing on April 6, 2023, and took the motion under advisement.

## DISCUSSION

### I. Legal Standard

The Fifth Circuit has established a two-step inquiry in determining whether the parties have agreed to arbitrate a claim. "The first is contract formation—whether the parties entered into any arbitration agreement at all. The second involves contract interpretation to determine whether this claim is covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis in original). In the absence of a valid clause delegating the threshold issue of arbitrability to the arbitrator, both steps are questions for the Court. *Id.* Where the parties' contract delegates the question of arbitrability to the arbitrator, however, a court possesses no authority to decide whether the parties' dispute falls within the scope of the agreement. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

Although there is a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *TRC Envt'l Corp. v. LVI Facility Servs., Inc.*, 612 F. App'x 759, 762 (5th Cir. 2015). Hence, the party moving to compel arbitration bears the initial burden of proving the existence of a valid agreement to arbitrate. *See Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018). Once the moving party has met its initial burden, the burden shifts to the party resisting arbitration to assert a reason that the arbitration agreement is unenforceable. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)).

"Section 2 of the FAA provides that written arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87 (1996) (quoting 9 U.S.C. § 2). "[A]s a matter of federal law, arbitration agreements and clauses are to be enforced *unless* they are invalid under principles of state law that govern all contracts." *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 166 (5th Cir. 2004) (emphasis in original) (interpreting Section 2). Thus, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Casarotto*, 517 U.S. at 687.

## II. Analysis

### A. Whether the Arbitration Provision Is Valid and Enforceable

In conducting the first inquiry, whether there is a valid arbitration agreement, courts "distinguish between 'validity' or 'enforceability' challenges and 'formation' or 'existence' challenges." *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 551 (5th Cir. 2018) (citing *Rent-A-Center,*

*W., Inc. v. Jackson*, 561 U.S. 63, 70 n.2 (2010) and *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)). Federal courts have authority where a party questions the "very existence of a contract" containing the arbitration agreement. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004).

Courts "do not consider general challenges to the validity of the entire contract." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018) (citing *Buckeye*, 546 U.S. at 449). Because an arbitration agreement is severable from the underlying contract under Section 2 of the FAA, a challenge "to the contract as a whole . . . does not prevent a court from enforcing a specific agreement to arbitrate." *Rent–A–Center*, 561 U.S. at 70. Thus, courts "must distinguish arguments regarding the validity of the arbitration agreement from arguments regarding the validity of a contract as a whole." *Lefoldt ex rel. Natchez Reg'l Med. Ctr. Liquidation Tr. v. Horne, L.L.P.*, 853 F.3d 804, 814 (5th Cir. 2017). The court is permitted to consider arguments about contract formation, including arguments that a contract was never formed. *Edwards*, 888 F.3d at 744. But once the court determines there is a valid arbitration agreement, the arbitrator must decide arguments that target the validity of the contract generally. *Id.*

Though the difference between formation and validity may be unclear at the margins, the Supreme Court has suggested that the category of arguments that question the very existence of an agreement include "whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." *Kubala*, 830 F.3d at 201–02 (citing *Buckeye*, 546 U.S. at 444 n.1). "[U]nless the party 'challenge[s] the delegation provision specifically,' the Court 'must treat it as valid . . . and must enforce it . . . , leaving any challenge to the validity of the Agreement as a whole [i.e, the arbitration agreement] for the arbitrator.'" *Id.* (quoting *Rent-A-Center*, 561 U.S. at 72).

7

Whether the parties entered a valid arbitration contract turns on state contract law. *Kubala*, 830 F.3d at 202. The June 2022 MSA contains a choice-of-law provision. *See* ECF No. 23-2, Ex. 8, Schedule 2 (identifying the "State of Texas, USA and the federal laws of the USA" as the "Governing Law" in the United States). As federal law provides that state law governs this question and no party disputes the validity of the choice-of-law provision specifically, the Court will analyze the agreement under Texas law. *See Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) ("[I]n determining whether the parties agreed to arbitrate a certain matter, courts apply the contract law of the particular state that governs the agreement.").

Texas law provides that the party attempting to enforce an arbitration agreement must show the agreement meets all requisite contract elements. *Specialty Select Care Ctr. of San Antonio, L.L.C. v. Owen*, 499 S.W.3d 37, 43 (Tex. App.—San Antonio 2016). Under Texas law, "[t]he elements needed to form a valid and binding contract are (1) an offer; (2) acceptance in strict compliance with the offer's terms; (3) a meeting of the minds; (4) consent by both parties; (5) execution and delivery; and (6) consideration." *Id.* When an arbitration agreement is part of an underlying contract, the rest of the agreement provides the necessary consideration. *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005).

Plaintiffs do not dispute that "during a short period of some customers' relationship with Rackspace, an arbitration agreement existed." ECF No. 30 at 9. Rather, they insist that Plaintiffs who were Rackspace users before the arbitration clause—none of whom are identified in Plaintiffs' response—are not bound by it because the June 2022 MSA represents an unenforceable, retroactive "modification" of which users had no notice. *Id.* at 12–13, 18. To the extent that users did have notice of the June 2022 MSA, Plaintiffs argue that they assented to arbitration under economic duress. *Id.* at 12.

8

"Under ordinary contract principles, a party may be bound by an agreement even in the absence of a signature, provided that the actions of the parties reflect a mutual intent to be bound." *Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 227 (5th Cir. 2008) (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609–10 (Tex. 1972)). Such evidence of assent can include continued use of services beyond the effective date of an amendment to an existing contract. *See, e.g.*, *Garcia v. Discover Bank*, No. EP-19-CV-00176, 2019 WL 13191640, at *2 (W.D. Tex. Oct. 4, 2019) (plaintiff consented to terms of updated credit card agreement by continuing to use her credit card); *May v. Expedia, Inc.*, No. A-16-CV-1211-RP, 2018 WL 4343445, at *3 (W.D. Tex. July 19, 2018), *report and recommendation adopted*, No. 1:16-CV-1211-RP, 2018 WL 4343427 (W.D. Tex. Aug. 27, 2018) (collecting cases finding mutual assent where party continued using website despite being aware that continued use of that website would be considered assent to agreement); *Masters v. Time Warner Cable, Inc.*, 920 F. Supp. 2d 766, 770–71 (W.D. Tex. 2012) (customer bound by arbitration agreement because he continued to accept services).

The Court concludes that, under Texas law, Plaintiffs' continued use of the services before and through the Security Incident is sufficient evidence of their intent to be bound by the terms of the June 2022 MSA. The suggestion that the arbitration clause was a "modification" to the MSA of which Plaintiffs had no notice is unavailing. The precise language of the arbitration provision has remained unchanged since 2019, and a substantively similar requirement to arbitrate any dispute or claim relating to or arising out of the MSA has been part of the operative agreement for over a decade. *See* ECF No. 23-2, Prewitt Decl. ¶ 29. Both Rackspace and its users were bound by an agreement to arbitrate long before the Security Incident occurred. Moreover,

because this dispute arose months after the June 2022 terms went into effect, no retroactive application of the arbitration provision is implicated or required.

Plaintiffs further argue that they agreed to the arbitration under economic duress because shifting email platforms would have caused them significant hardship. Economic duress occurs when one party takes unjust advantage of the other party's economic necessity or distress to coerce the other party into making an agreement. *In re RLS Legal Sols., L.L.C.,* 156 S.W.3d 160 (Tex. App. 2005). It is a defense to the enforcement of the contract. *Id*. Rather, to establish an economic-duress defense, Plaintiffs must show: (1) a threat by Rackspace "to do something which [Rackspace] had no legal right to do," (2) that the threat "destroyed the free agency" of Plaintiffs, (3) that "the restraint caused by the threat was imminent," and (4) that Plaintiffs "had no means of protection." *In re RLS Legal Sols., L.L.C.*, 156 S.W.3d 160, 163 (Tex. App.—Beaumont 2005, orig. proceeding).

Plaintiffs have failed to identify any "threat" made by Rackspace or any reason to believe that they had "no means of protection" against the arbitration provision. Plaintiffs have had more than a decade to shift email platforms since the requirement to arbitrate became effective; their failure to do so does not render the agreement unenforceable. "The mere fact that a person enters into a contract with reluctance, or as a result of the pressures of business circumstances, does not, of itself, constitute economic duress invalidating the contract." *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 294 (Tex. App.—Corpus Christi–Edinburg 2003, pet. denied). Plaintiffs have failed to establish that the arbitration agreement is unenforceable as the result of economic duress.

Along with state contract defenses, this Court can determine that an arbitration is invalid or unenforceable on any grounds as exist at law or in equity for the revocation or

unenforceability of any contract. *See* 9 U.S.C. § 2. Unconscionable contracts, whether relating to arbitration or not, are unenforceable under Texas law. *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 892 (Tex. 2010) (orig. proceeding). "Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006). In applying the unconscionability standard, the crucial inquiry is whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights. *Olshan*, 328 S.W.3d at 894. When the nonmovant proves that the arbitration provision is not valid or cannot otherwise be enforced, the motion to compel must be denied. *See Zamora v. Swift Transp. Corp.*, No. EP-07-CA-00400-KC, 2008 WL 2369769, at *4 (W.D. Tex. June 3, 2008).

Plaintiffs assert that the arbitration agreement is procedurally unconscionable because Rackspace imposed the arbitration provision unilaterally, without notice or an opportunity to negotiate, after Plaintiffs had "center[ed] their digital lives around Defendant's email services." ECF No. 30 at 15. When evaluating a claim of procedural unconscionability, courts consider several factors: (1) the entire atmosphere in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the non-bargaining ability of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable. *Delfingen US-Tex., L.P., v. Valenzuela*, 407 S.W.3d 791, 798 (Tex. App.—El Paso 2013, no pet.).

"Under Texas law, whether an agreement is procedurally unconscionable rests on whether the contract results in unfair surprise or oppression." *Wiatrek v. Flowers Foods, Inc.*, No. SA-17-CA-772-XR, 2018 WL 3040583, at *3 (W.D. Tex. June 16, 2018). That "one party

11

may have been in a superior bargaining position" does not render an agreement procedurally unconscionable. *Id.*; *accord In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006) (orig. proceeding). Nor is it sufficient to allege unequal bargaining positions and a lack of notice. *See, e.g.*, *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1077 (5th Cir. 2002) (no procedural unconscionability even where "unsophisticated" plaintiffs alleged that they were told arbitration agreement was "standard documentation," received "no explanation of the document," and had no "opportunity to read or negotiate the agreement's terms").

Reviewing Plaintiffs' allegations of procedural unconscionability in light of applicable Texas law, the Court concludes that they are insufficient to invalidate the arbitration agreement for procedural unconscionability. Plaintiffs cannot plausibly claim to be unfairly surprised by an agreement to arbitrate that has been effective for over a decade.

Finally, Plaintiffs argue that the arbitration provision is substantively unconscionable because: (1) it imposes "excessive arbitration costs" on Plaintiffs; (2) it precludes Plaintiffs from seeking "meaningful injunctive relief," thereby exposing them to "further irreparabl[e] harm[]"; and (3) it is illusory because under its terms, "[Rackspace] could issue changes to the arbitration provision that could apply retroactively to the rights of Plaintiffs." ECF No. 30 at 18–19. The Court will address each argument in turn.

When a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, "that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000). "Evidence of the 'risk' of possible costs of arbitration is insufficient evidence of the prohibitive cost of the arbitration forum." *In re Olshan Found. Repair Co.*, 328 S.W.3d 883, 895 (Tex. 2010) (orig. proceeding) (citing *Green Tree*, 531 U.S. at 91). "[A] total comparison of the total costs of

12

the two forums is the most important factor" in making this determination, and "[i]f the total cost of arbitration is comparable to the total cost of litigation, the arbitral forum is equally accessible." *Id.* at 894–95.

Plaintiffs acknowledge that the arbitration provision is "silent as to the allocation of fees" but contend that the applicable AAA filing fee of $200 per arbitration would "deter the[m] . . . from bringing an action at all," given that Section of 8 of the MSA purports to limit damages at approximately $131.88 per mailbox. ECF No. 30 at 16–17, n.17 (calculating the cost of twelve months of service at $10.99 per month). At the hearing, counsel for Rackspace pointed out that the AAA allows plaintiffs to apply for fee reductions or deferrals and that the operative complaints seek thousands of dollars in compensatory and punitive damages.

Given the class action waiver in the June 2022 MSA, *see* ECF No. 23-2, Prewitt Decl. ¶ 29; Ex. 8 § 10.3, however, it appears that even the AAA filing fee of $200 per individual arbitration would be more cost effective than litigating each Plaintiff's claim individually in this District, where the cause of initiating a lawsuit is currently $402. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1412 (2019) ((holding that arbitration must proceed on the traditional individual basis in the absence of an "affirmative 'contractual basis for concluding that the part[ies] agreed to [class arbitration]'" (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010)) (alterations in original)); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (explaining "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings" and recognizing the enforceability of class action waivers). Accordingly, Plaintiffs' argument that individual arbitration would be prohibitively expensive is unavailing.

Turning to Plaintiffs' second argument, the Court observes that nothing in the arbitration agreements precludes injunctive relief. Nonetheless, Plaintiffs assert that the provision prevents them from obtaining "*meaningful* injunctive relief" and "essentially waive[s] Plaintiffs' remedies afforded by the statute." ECF No. 30 at 17–18 (emphasis added). At least one court in this district has held that an arbitration provision limiting recovery to money damages was unconscionable because it impaired the plaintiff's right to pursue injunctive relief under the Lanham Act. *See The Shipman Agency, Inc. v. TheBlaze, Inc.*, 315 F. Supp. 3d 967, 973 (S.D. Tex. 2018). Unlike the arbitration provision in that case, however, the MSA does not purport to limit the kind of remedies available at arbitration. ECF No. 23-2, Ex. 8 § 10.2. There is therefore no reason to believe that the provision forces Plaintiffs to forgo any substantive right to injunctive relief. *See Concepcion*, 563 U.S. at 337 (reading arbitration provision to allow arbitrator to "award any form of individual relief, including injunctions and presumably punitive damages"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."); *cf. Kilgore v. KeyBank, Nat'l Ass'n*, 673 F.3d 947, 951 (9th Cir. 2012), *on reh'g en banc*, 718 F.3d 1052 (9th Cir. 2013) (concluding that the Supreme Court's ruling in *Conception* preempted California's state-law rule prohibiting the arbitration of claims for broad, public injunctive relief).

Finally, the Court addresses Plaintiffs' argument that the arbitration agreement is illusory. "An arbitration agreement is illusory if it binds one party to arbitrate, while allowing the other to choose whether to arbitrate." *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 505 (Tex. 2015). The arbitration provision does not allow Rackspace to choose whether to

arbitrate claims arising out of the MSA. *See* ECF No. 23-2, Ex. 8. § 10.2 ("any dispute or claim relating to or arising out of the Agreement shall be submitted to binding arbitration"). Still, Plaintiffs argue that the arbitration agreement is illusory because Rackspace "could issue changes to the arbitration provision that could apply retroactively to the rights of Plaintiffs." ECF No. 30 at 18. In other words, Plaintiffs argue that Rackspace could unilaterally revoke its promise to arbitrate and thus that there is no mutuality of obligation.

While the Court disagrees with Plaintiffs' reading of the MSA,[4] the question must be submitted to the arbitrator because it bears on the validity of the MSA as a whole. *Buckeye*, 546 U.S. at 446. The Fifth Circuit has held that, where, as here, the party resisting arbitration "does not dispute the existence of a contract," but rather "argues that the arbitration provision is an illusory promise," that "argument is in the nature of a validity challenge." *Arnold*, 890 F.3d at 551 (addressing plaintiff's argument that defendant's authority to "modify any terms or conditions without providing notice" rendered an arbitration provision illusory under Texas law); *see also Grasso Enters., LLC v. CVS Health Corp.*, 143 F. Supp. 3d 530, 539 (W.D. Tex. 2015) (Rodriguez, J.) (concluding that where plaintiff's unilateral-amendment challenge "appl[ied] to the validity of the . . . [contracts] in their entireties," it was for the arbitrator to decide). Thus, the question of whether the arbitration provision is illusory, and therefore unenforceable, is ultimately for the arbitrator to decide.

---

[4] Even if Plaintiffs' illusoriness challenge were for this Court to resolve, Rackspace could not have avoided arbitrating claims arising out of the Security Incident by amending the arbitration provision after the fact—the mutual agreement to arbitrate existed at the time of the Security Incident and will survive any subsequent termination or modification of the June 2022 MSA. *See* ECF No. 23-2, Ex. 8 § 11.7 (providing that § 10 of the June 2022 MSA, which includes the arbitration provision, "shall survive expiration or termination of th[e] MSA"). Simply put, Rackspace has no power to modify the arbitration provision in effect at the time of the Security Incident, which required *both* parties to submit to binding arbitration. Thus, the arbitration agreement is not illusory. *See The Shipman Agency*, 315 F. Supp. 3d at 973 (arbitration provision not illusory where agreement provided that arbitration "will survive any expiration or termination of this Agreement," thereby precluding defendant from "avoid[ing] arbitration . . . by unilaterally changing [the agreement's] terms"); *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607–08 (Tex. 2005) (orig. proceeding) (per curiam) (arbitration provision not illusory where it allowed for unilateral amendment with notice but provided that "any obligations that [arose] prior to the termination . . . survive[d] such termination").

### B. Whether Plaintiffs' Claims Fall Within the Scope of the Arbitration Agreement

Plaintiffs also argue that their claims fall outside of the scope of the arbitration clause because the MSA could not and did not contemplate third-party criminal activity such as the Security Incident. *See* ECF No. 30 at 11 (citing *Jones v. Halliburton Co.*, 583 F.3d 228 (5th Cir. 2008) (concluding that an alleged sexual assault of employee while she was stationed at company facility in Iraq were not "related to" her employment within meaning of arbitration provision, so as to be arbitrable under the FAA)). Rackspace responds that, under the AAA rules incorporated by reference in the arbitration clause, the arbitrability of Plaintiffs' claims are a question for the arbitrator rather than for the Court. ECF No. 23 at 28.

When an agreement to arbitrate contains a delegation clause, the courts should compel arbitration and need not consider arbitrability. *See Taggatz*, 2018 WL 11430810, at *2. Here, the arbitration provision expressly states that "[t]he arbitration shall be conducted . . . in accordance with the Commercial Rules of the AAA in effect at the time the dispute or claim arose." *See* Prewitt Decl., Ex. 8 § 10.2. Courts, including the Fifth Circuit and this Court, routinely find that incorporation of the AAA rules into an agreement to arbitrate signifies the parties' intent to delegate the question of arbitrability to the arbitrator. *See Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("[E]xpress adoption of [the AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Wiatrek.*, 2018 WL 3040583, at *4 ("The Arbitration Agreements incorporate the [AAA] rules, which give the arbitrator the power to determine arbitrability.").

Because Plaintiffs have failed to specifically challenge the validity or enforceability of the delegation provision, the Court agrees with Rackspace that any questions concerning

arbitrability are reserved for the arbitrator. *See Henry Schein*, 139 S. Ct. at 529; *Petrofac, Inc.*, 687 F.3d at 675; *Taggatz*, 2018 WL 11430810, at *2.

### C. Whether the Case Should be Dismissed or Stayed Pending Arbitration

The final issue is whether Plaintiffs' claims should be stayed pending resolution of the arbitration or dismissed. The FAA provides that courts shall enter a stay pending arbitration "on application of one of the parties." 9 U.S.C. § 3; *see also Mayton v. Tempoe, LLC*, No. SA-17-CV-179-XR, 2017 WL 2484849, at *6 (W.D. Tex. June 7, 2017) (explaining the stay requirement set forth in Section 3 of the FAA). Thus, the court may not deny a stay in such a situation. "This rule, however, was not intended to limit dismissal of a case in the proper circumstances. The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (collecting cases). In these situations, ordering a stay as opposed to a dismissal, would serve no purpose because "[a]ny post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law." *Id.* (quoting *Sea-Land Serv., Inc. v. Sea-Land of P.R., Inc.*, 636 F. Supp. 750, 757 (D.P.R. 1986)).

Even in these circumstances, though, "dismissal is not required; rather, the district courts have discretion to do so, and also have discretion to stay the case or dismiss without prejudice." *Glazer's, Inc. v. Mark Anthony Brands Inc.*, SA-11-CV-977-XR, 2012 WL 2376899, at *6 (W.D. Tex. June 22, 2012) (citing *Apache Bohai Corp. v. Texaco China*, 330 F.3d 307, 331, n.9 (5th Cir. 2003)). Entry of a stay as opposed to a dismissal may be appropriate where "the district

court perceives that it might have more to do than execute the judgment once arbitration has been completed." *Apache Bohai Corp.*, 330 F.3d at 309.

Nothing in the caselaw or the applicable agreements—the arbitration provision, the class action waiver, or Schedule 2—indicates that any of the claims raised in this action can be excused from the arbitration requirement. Plaintiffs here present no justification for a stay rather than a dismissal, and indeed, this Court is aware of no further actions it that might need to take beyond executing the judgment upon completion of the arbitration. As a result, the Court finds that this case should be dismissed.

## CONCLUSION

Rackspace's motion to compel individual arbitration and dismiss this case (ECF No. 23) is **GRANTED**. Accordingly, Plaintiffs' claims are **DISMISSED WITHOUT PREJUDICE**. A final judgment pursuant to Rule 58 will follow in each of the consolidated cases. This Clerk is **DIRECTED** to close this case.

It is so **ORDERED**.

**SIGNED** this 18th day of May, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE